FILED

2005 Dec-02  AM 10:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARGARET BRENIMAN** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **1:05-cv-00341-VEH-TMP** |
| **UNUM PROVIDENT; UNUM LIFE INSURANCE CO. OF AMERICA,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## MEMORANDUM OF DECISION

The court has before it two motions for summary motion.  Plaintiff Margaret Breniman filed a motion (docs. # 10-11) for summary judgment on May 11, 2005. Defendant UNUM Provident, UNUM Life Insurance Company of America (UNUM) filed a motion (doc. # 13) for summary judgment on June 1, 2005. Pursuant to the court's May 11, 2005 and June 1, 2005 orders, the motions were deemed submitted, without oral argument, on June 27, 2005.

## I. Procedural History

Breniman commenced this action on January 10, 2005 by filing a complaint in the Circuit Court of Etowah County, Alabama, alleging wrongful termination of her long term disability insurance coverage.  UNUM removed the complaint to

this court on February 14, 2005, and asserted federal question jurisdiction.
Plaintiff did not contest the removal as this case is properly one under the
Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.
Breniman and UNUM both filed motions for summary judgment, asserting that no
genuine issue of material fact exists and that each is entitled to judgment as a
matter of law.

The parties have filed briefs and submitted evidence in support of their
respective positions.  Plaintiff submitted a brief (doc. # 12) and evidence[1] (docs. #
10-11) in support of her motion for summary judgment on May 11, 2005.  On June
1, 2005, defendant filed a brief (doc. # 14) and evidence[2] (doc. # 16) in support of
its own motion for summary judgment and in opposition to plaintiff's motion for
summary judgment.  On June 15, 2005, plaintiff filed a brief and

---

[1] The plaintiff submitted the following evidence: affidavit of Margaret Breniman; 01/01/00 LTD insurance policy with 09/01/01 amendments; application for benefits with attending physician's statement; UNUM approval of LTD benefits; medical records from Dr. Kaufman -  02/28/01 until 07/22/03; medical records from Dr. McKee; medical records from Dr. Jesus Hernandez; 05/12/03 supplemental statement; 05/13/03 letter from Breniman to UNUM; 05/14/03 Kaufman attending physician statement; 08/20/03 Kaufman attending physician statement; 09/18/03 Kaufman attending physician statement; 09/29/03 clinical review request; clinical review by Janet Shepard dated 10/17/03; medical file review by Dr. Laird Caruthers dated 10/21/03; 10/31/03 termination letter; notice of appeal; 06/15/04 report from Dr. Hernandez; 06/29/04 report from Dr. Kaufman; social security disability award dated 07/08/04; and report of Targeted Multi-State Conduct Examination of UNUM regarding claim practices.

[2] The defendant submitted the following evidence: administrative record/claims file.

evidence[3] (doc. # 19) in response to defendant's motion and in reply to defendants's opposition to her motion.  On June 27, 2005, defendant filed a reply (doc. #20) to plaintiff's opposition to its motion for summary judgment.  All briefs and evidence have been considered.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there

---

[3] The plaintiff filed the following additional evidence: 08/16/02 letter from Genex to Breniman; 09/24/02 letter from Genex to Breniman; and 04/24/04 letter from Genex to Social Security ALJ regarding Breniman's claim.

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

4

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Breniman was employed as a research analyst by CAS, Inc., and was

afforded group long-term disability insurance coverage under an employee welfare

benefit plan issued by UNUM.  As a research analyst, Breniman was responsible

for analyzing program activities, creating planning documents, preparing and

utilizing data bases for cost analysis and financial management, and maintenance

of program security requirements.  (Def. Ex. Doc. No. UACL000041.)  Her job

description also stated that she "may use a computer . . .[,] travel to a customer's

office, system test site, or other company location."  (Id.)

---

[4] Although there are cross-motions for summary judgment, each side must still establish
the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.
See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (5th Cir.
1955); Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider
each motion independently, and in accordance with the Rule 56 standard.  See Matsushita Elec.
Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  "The fact that both parties
simultaneously are arguing that there is no genuine issue of fact, however, does not establish that
a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  See
WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed.
1998).

*A.  The Policy*

The policy at issue provides coverage for disability, defined in relevant part as being "limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and . . . [having] a 20% or more loss in your indexed monthly earning due to the same sickness or injury."  (Def. Ex. Doc. No. UACL00724).  The policy further defines disability as "[a]fter 60 months of payment" for an above disability, an individual is "unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience" "due to the same sickness or injury."  (Id.) (emphasis omitted).

The policy also contains a twenty-four month mental and nervous provision. This provision states that "[d]isabilities due to sickness or injury which are primarily based on self reported symptoms and disabilities due to mental illness have a limited pay period up to 24 months."  (Id. at UACL00716.)  Self-reported symptoms are defined in the policy as "the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine."  (Id. at UACL00702.)

The policy affords discretionary authority to UNUM to make claims

7

decisions: "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (Id. at UACL00728)

### B. Breniman's Claim for Disability

Breniman filed a claim for disability benefits on August 8, 2001. (Id. at UACL00025-26.) Along with her claim, Breniman submitted an attending physician statement and records from her family physician, Dr. Lori E. Kaufman and her psychiatrist, Dr. Calvin J. Harris. (Pl. Ex. 3.) Dr. Kaufman's diagnosis of Breniman was fibromyalgia, manic depression, bipolar disorder, anxiety, and attention deficit disorder, which resulted in Breniman being extremely limited to everyday minor tasks. (Id.) Dr. Kaufman indicated that Breniman was "permanently disabled" and "unable to maintain any gainful employment." (Id.) This diagnosis was supported by Breniman medical records from May 14, 1997 through August 28, 2001. (Def. Ex. Doc. No. UACL00033, UACL00111-168.)

Of particular significance in Dr. Kaufman's patient notes was one on January 21, 2000. In those notes, Dr. Kauffman stated that she "really thinks [Breniman] is having some type of psychotic break" and recommended that Breniman see a doctor at the Alabama Psychiatric Services, whom she had seen before. (Id. at UACL00159.) Dr. Kauffman added that "if she [Breniman] does

need disability, I have recommended she seek it through her psychiatric need."

(Id.)   Her psychiatrist, Dr. Harris, diagnosed Breniman with Major Depression

Recurrent Moderate which resulted in Breniman's inability to concentrate and

focus enough to be employed.  (Id. at UACL00060.)  This diagnosis was

supported by medical records ranging from September 15, 1998 through August

16, 2001.  (Id. at UACL00066-103.)

### 1.  Approval of Mental Disability Claim and Updates

On January 7, 2002, UNUM notified Breniman that her request for

disability benefits was approved based on mental disability.  (Pl. Ex. 4.)  In this

letter, UNUM explained the terms of the coverage, and encourages Breniman to

apply for Social Security disability benefits (SSDI) if her disability is expected to

extend beyond five months.  (Id.)  UNUM also offered to refer Breniman to Genex

to assist her in applying for SSDI.  (Id.)

On April 18, 2003, UNUM requested updated certification of disability

including a supplemental statement and capacities form from Breniman.  (Def. Ex.

Doc. No. UACL00281.)  Breniman submitted a supplemental statement dated May

12, 2003, stating that the "[p]yschiatric diagnosis is Bipolar disorder and

Panic/Anxiety disorder with agoraphobia."  (Id. at UACL00399.)  Breniman also

submitted an attending physician statement from Dr. Kaufman dated May 14,

2003.  (Id. at UACL00396-397.)  This statement indicated that the only change in

Breniman's diagnosis was the addition of pulmonary fibrosis since the last report.

(Id.)  Additionally, Dr. Kaufman's evaluation of her functional capacities rated

Breniman's limitations a "severe" rating in 6 out of 16 categories.  (Id.)

## 2.  Re-evaluation of Claim and Expiration of Benefits

On July 18, 2003, Breniman requested that her disability claim "be

re-evaluated on impairments primarily based on medical diagnosis."  (Id. at

UACL00402.)  Shortly thereafter, on September 10, 2003, UNUM advised

Breniman that her claim for disability benefits would expire on October 23, 2003,

under the policy provision which has a limitation for mental disability of

twenty-four months.  (Id. at  UACL00469.)  UNUM also acknowledged receipt of

Breniman's letter requesting re-evaluation of her claim based on general medical

conditions.  (Id.)  UNUM advised Breniman that updated medical information

should be returned by September 25, 2003.  (Id. at UACL00467-469.)

Breniman submitted additional medical records from two primary

physicians.[5]  First, she submitted additional documentation from Dr. Kaufman.

---

[5] Breniman also submitted medical records from Dr. J. Mckee, D.P.M., who treated
Breniman for global foot pain, burning in her feet and leg length discrepancy (Pl. Ex. 6; Def. Ex.
Doc. No. at  UACL00481-487), and medical records from her physical therapy treatments in
Huntsville, Alabama, dating from June 18, 2002, to October 27, 2002.  (Def. Ex. Doc. No.
UACL00410-445.)

(Id. at UACL00488-578.)  These records indicate that sometime in 1999,

Breniman's long-standing reports of muscle pain and fatigue were formally

labeled as consistent with fibromyalgia.[6]  (Id.)  After that diagnosis, Dr.

Kaufman's  notes document ongoing routine care for management of various

general health concerns.  (Id.)  On January 12, 1999, Dr. Kaufman mentioned that

Breniman may have pulmonary fibrosis, but the records contain no medical tests

regarding this diagnosis.[7]  (Id.)   Moreover, despite frequent requests to stop

smoking, the records indicated that Breniman continued to smoke up to two packs

of cigarettes a day.  (Id.)

Second, Breniman submitted documentation from Dr. Jesus Hernandez, a

---

[6] Fibromyalgia is a rheumatic disorder characterized by chronic pain, tenderness, and stiffness of the muscles, tendons, and ligaments, without detectable inflammation.  See Merriam-Webster Medical Dictionary, available at http://www.nlm.nih.gov/medlineplus/ mplusdictionary.html.  The American College of Rheumatology criteria for clinical diagnoses requires "a history of at least three months of widespread pain, and pain and tenderness in at least 11 of 18 tender-point sites.  These tender-point sites include fibrous tissue or muscles of the neck, shoulder, chest, rib cage, lower back, thighs, knees, arms (elbows), and buttocks."  See Merriam-Webster Medical Encyclopedia, available at: http://www.nlm.nih.gov/medlineplus/ encyclopedia.html.  The cause of fibromyalgia is unknown, there is no cure, and there are currently no objective laboratory tests for its presence or severity.  See Neumann v. Prudential Ins. Co. of Am., 367 F.Supp.2d 969, 982 (E.D. Va. 2005) (collecting authorities).  Fibromyalgia "can interfere with a person's ability to carry on daily activities . . . .  And while some people may have such a severe case of fibromyalgia as to be totally disabled from working, most do not."  Id. (citing Wolfe, et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 Arthritis & Rheumatism 160-72 (1990)).

[7] There is a note on March 4, 2002, that some tests were ordered.  (Def. Ex. Doc. No. UACL00488-578.)

rheumatologist.  Breniman's first visit to Dr. Hernandez was on September 10,

2002.  (Pl. Ex. 7.)  Dr. Kaufman referred her for evaluation of possible

fibromyalgia.  (Id.)  At this initial consultation, Dr. Hernandez noted the "presence

of some tender points of fibromyalgia, but not rather impressive."  (Id.)  Although

he stated that Breniman's symptoms "could be attributable to fibromyalgia," he

opined that her reported pain and fatigue was "not uncommon in many psychiatric

disorders including the ones that [Breniman] has been experiencing."  (Id.)  Dr.

Hernandez recommended exercise and physical therapy.  (Id.)

Breniman returned to Dr. Hernandez on December 12, 2002, and was

"tearful and depressed."  (Id.)  Dr. Hernandez noted that she "certainly has

significant depressive disease disorder."  (Id.)  Breniman told Dr. Hernandez that

she had not been exercising regularly.  (Id.)  He noted numerous trigger points, but

her cardiopulmonary exam was normal.  (Id.)  Dr. Hernandez increased her

medicine.  (Id.)  In Breniman's most recent visit to Dr. Hernandez on April 15,

2003, Dr. Hernandez continued to document trigger points on exam, but gave no

specifics as to location and number of points.  (Id.)

On October 17, 2003, Janet Shephard, BA, BSN, RN, completed a General

Medical Clinical Review for UNUM  (Pl. Ex. 14; Def. Ex. Doc. No. UACL00600-

601.)  Shephard summarized Breniman's medical records and noted that Dr.

Kaufman stated on May 14, 2003 and August 20, 2003 that Breniman was

"completely and totally disabled" because of fibromyalgia and pulmonary fibrosis.

(Id.) As for Shepard's analysis of the claim, she found the following:

> While [Breniman's] subjective symptoms have been attributed to
> [fibromyalgia], they are not exclusive to this ill defined syndrome,
> and in the presence of a psychiatric condition it is difficult to "sort
> out" the true etiology for her complaints.  Because [fibromyalgia] is
> considered a "diagnosis of exclusion" results of routine medical
> testing will be absent for physical pathology.  Instead, this diagnosis
> is based purely on a patient's subjective reports, length of symptoms
> and presence of "tender points" on exam.  None the less, the question
> here is whether there is substantial, ample and consistent clinical
> evidence contained within the records to clearly support impairment.

(Id.) As a result, Shepard concluded that there were "no compelling clinical

findings to support functional deficit secondary to a medical condition."  (Id.)

She also noted that she needed more information to validate and assess her claim

of pulmonary fibrosis.  (Id.)

On October 21, 2003, Dr. Laird D. Caruthers, M.D., F.A.A.F.P., a licensed

physician board certified in family practice, also reviewed Breniman's file.  (Pl.

Ex. 15.)  Dr. Caruthers first recounted Breniman's treatment with her psychiatrist,

Dr. Harris.  (Id.)  He then reviewed all of the medical records from Dr. Kaufman,

and provided the following sample:

> On August 26, 2002, for "problem list", Dr. Kaufman said the
> claimant had right foot pain with probable neuropathy; joint/muscle

pain; fatigue; fibromyalgia; dysfunctional uterine bleeding; and back pain. Dr. Kaufman then writes "Physical exam: exam is normal." At the next visit, on September 25, 2002, Dr. Kaufman writes "She is basically at this point completely disabled." Dr. Kaufman then goes on to list claimant's subjective work limitations and then says "Most importantly, even if she could work physically, her ability to concentrate and function is impaired most of the time. I believe this patient is permanently and totally disabled. Her current tests with EMG and nerve conduction studies were normal. At this point, her fibromyalgia is basically controlled as long as she is not working. We are going to continue to pursue disability."

(Id.) Dr. Caruthers next reviewed medical records from Dr. Hernandez regarding possible fibromyalgia. (Id.)

Dr. Caruthers noted that Breniman applied for a third time[8] for SSDI sometime in 2002. (Id.) On January 17, 2003, she was notified that her application was denied because, although Breniman contended that she was "disabled because of bipolar, attention deficit hyperactive disorder, anxiety, fibromyalgia and irritable bowel syndrome," "the evidence shows you are able to carry out most activities." (Id.) Social Security, therefore, determined that "based on [her] age, education and past work experience, [Breniman was] capable of performing certain types of work and [did] not meet the requirements for disability benefits." (Id.)

_____

[8] Breniman first applied in 1995 due to "manic depression," but that application was denied. (Pl. Ex. 15.) She reapplied in 2000, but did not follow through with the application. (Id.)

After a review of all of the above, and additional supplemental statements by Dr. Kaufman,[9] Dr. Caruthers concluded:

> I do not doubt that this lady has trouble coping with life. She obviously has some psychiatric problems which, even after years of treatment, have not totally resolved. I cannot comment on their severity of her prognosis regarding same. But, regarding general medical problems, there is zero evidence in this file for any significant physical impairments due to them. No doubt she gets tired and has aches and pains, but there is simply no basis for a claim of disabling proportions due to a medical ailment here.

(Id.)

### C.  UNUM's Denial of Benefits and Breniman's Appeals

On October 31, 2003, UNUM informed Breniman that based on a review of the additional information submitted in request for continued disability benefits due to claimed general medical conditions of fibromyalgia, chronic fatigue, and pulmonary fibrosis, Breniman did not qualify for continued disability benefits under the policy. (Pl. Ex. 16; Def. Ex. Doc. No. UACL00612-614.) The letter also informed Breniman of the appeals process if she wished to appeal the decision. (Id.) On January 28, 2004, Breniman informed UNUM of her intent to appeal its decision. (Pl. Ex. 17; Def. Ex. Doc. No. UACL00616-617.)

---

[9] All of the supplemental statements completed by Dr. Kaufman state that Breniman is totally disabled and unable to work. (See Pl. Exs. 10, 11, 12.) Dr. Kaufman's statement on September 18, 2003 further states that Breniman's "disability should not be based on mental illness alone. Patient has severe physical limitations." (Pl. Ex. 12.)

1.  <u>The First Appeal</u>

On February 12, 2004, UNUM's senior appeals specialist, Andy

Fitzsimmons, decided to return Breniman's file for further investigation.  (Def. Ex.

Doc. No. UACL00619-620.) After summarizing the history of Breniman's file,

Fitzsimmons noted that Breniman had submitted a letter indicating that records

from Dr. Richard M. Sneeringer, a pulmonary doctor, would validate her

pulmonary complaints and diagnosis.  (<u>Id.</u>)  Fitzsimmons, therefore, recommended

that UNUM order records from Dr. Sneeringer and have them reviewed by the

appropriate medical resource before deciding her appeal.  (<u>Id.</u>)

UNUM notified Breniman of its decision to gather information regarding

the diagnosis of pulmonary fibrosis and determine whether the symptoms of that

condition would preclude Breniman from working in her occupation according to

the terms of the policy.  (<u>Id.</u> at UACL00622.)  On April 9, 2004, Breniman

informed UNUM that "Dr. Sneeringer does not support the diagnosis of

pulmonary fibrosis."  (<u>Id.</u> at UACL00645.)  Included with the letter were progress

notes from Dr. McKee and a copy of a request for medical records from Dr.

Hernandez.  (<u>Id.</u>)

On June 15, 2004, Dr. Hernandez responded to the request and submitted

additional medical records.  (Pl. Ex. 18.)  In his cover letter, Dr. Hernandez stated

16

that he has been providing "rheumatological care for Ms. Breniman . . . for her fibromyalgia syndrome" which had been diagnosed in September 2002.  (Id.)  In the medical records, Dr. Hernandez repeatedly characterized Breniman's condition as "fibromyalgia in the setting of severe depression," noted significant weight gain, and continually recommended exercise.  (Id.)  He also noted the presence of trigger points, but did not specify the locations or precise number.  (Id.)

On May 11, 2004, UNUM notified Breniman of the completion of the appellate review.  This letter included a summary of UNUM's process in determining that the original claim decision was correct and appropriate.  (Def. Ex. Doc. No. UACL00650-652.)  Breniman's attorney notified UNUM of their intent to appeal for a second time.  (Id. at UACL00656.)

## 2.  The Second Appeal

On July 5, 2004, Breniman's attorney sent UNUM additional medical information including a report from Dr. Hernandez dated June 15, 2004, as well as medical records dated September 12, 2003, March 12, 2004, and March 30, 2004. Also included was a supplemental statement from Dr. Kaufman dated June 29, 2004.  (Pl. Ex. 19.)  Dr. Kaufman's supplemental statement summarized Breniman's condition as

a classic case of Fibromyalgia.  She experiences severe and

17

widespread pain and stiffness in the joints, muscles and bones.  A baseline degree of pain is always present.  She has chronic fatigue, decreased endurance, suffers constant headaches and experiences sleep disorder.  Although her endurance varies, she usually requires rest, ranging from one to three hours during the day.  She experiences feelings of depression (sadness) and chronic anxiety.  She commonly experiences abdominal pain, bloating and alternating constipation and diarrhea (called irritable bowel syndrome (IBS)). As a result of these complications, she has difficulty concentrating on or performing simple mental tasks.  She also has osteoarthritis, which is a chronic condition.  This disease affects her knees, hips and spine.  She has lost significant range of movement; as her osteoarthritis greatly interferes with her normal activities such as walking, standing, sitting and disrupted sleep.  The patient is physically limited to standing or walking less than one hour and sitting less than two hours each day.  She must exercise great caution when driving a vehicle or operating any machinery.  She has been diagnosed as having gastroesophageal reflux disease (GERD), a chronic condition affecting the lining of the stomach, which will require life long treatment.

(Id.)

During this second appeal, on July 8, 2004, Breniman was notified by the Social Security Administration of a favorable decision.  (Pl. Ex. 20.)  The decision concluded that Breniman "ha[d] been under a 'disability' as defined by the Social Security Act and regulations, since April 30, 2001."  (Id.)  The ALJ found that the medical evidence established that Breniman had severe impairments of "bipolar disorder, fibromyalgia, generalized anxiety disorder, osteoarthritis, and irritable bowel syndrome."  (Id.)  The ALJ listed only the bipolar disorder as "expected to preclude her from working for at least 12 continuous months."  (Id.)

18

On October 27, 2004, Dr. E.C. Curtis completed a Medical Consultant Review for UNUM based on a review of the record as of that date, with particular emphasis on material generated in the previous twelve months before the review. (Def. Ex. Doc. No. UACL00690-695)   Dr. Curtis gave a brief history of Breniman's medical conditions, including that "[b]y her report she has had psychiatric disorder since at least 1989.  More recently diagnosed as bipolar disorder and agoraphobia.  Given the fibromyalgia label in 1998.  Some suspicion of possible pulmonary fibrosis in 1999."  (Id. at UACL00695.)  Dr. Curtis then outlined Breniman's past claim and noted that "[i]n preparation for anticipation of discontinuance of payment, [Dr. Kaufman] in 08/03 wrote 'completely and totally disabled' due to fibromyalgia and (postulated) pulmonary fibrosis."  (Id.)

Dr. Curtis's opined "[t]o a reasonable degree of medical certainty" that "there [wa]s little or no support and no appreciably substantiating findings consistent with any of the following conditions:

- Headaches (noting "minimal complaints . . . and . . . no treatment");
- IBS ("only a few mentions . . . and no findings.  No indication of any treatment . . . or . . . effects on activities or functioning");
- OA (noting that "Rheumatologist in 09/02 indicated no definitive finding consistent with this disorder.  Few other mentions . . . until the advocacy letter in 06/04 [which] asserted involvement of 'knees, hips and spine.'"  No "x-ray or exam findings are offered in the office visit notes . . . other than that Dr. Kaufman says there is limited range of motion.  She provides no specifics.");

19

- Pulmonary fibrosis (noting that "claimant says diagnosis was 'corroborated' by a pulmonary specialist, but no documentation is provided to substantiate that" claim);
- Burning foot syndrome ("[n]o relevant findings of consequence . . . and [e]ssentially no ongoing references to any such condition.");
- Sleep disorder (noting "[n]o sleep studies" and "[n]o sedation other than . . . [prescription for an] antidepressant");
- GERD ("[m]ay well be a problem, but . . . fairly easy to control);
- Chronic Fatigue ("complaints . . . are readily explained by her affective disorder . . . . No indication that the minimum criteria for CFS were ever met.").

(Id. at UACL00692-693.)

Conversely, Dr. Curtis found "some evidence consistent with likelihood of fibromyalgia syndrome." (Id. at UACL00692.) He noted that her "[c]omplaints are compatible with that label" and that exam findings "at times show tender points and trigger points" and "palpable spasms." (Id.) Dr. Curtis's overall impression was that "[t]he most the facts allow . . . is . . . that she has probable fibromyalgia syndrome." (Id.) Even with this diagnosis, Dr. Curtis stated that "the condition is not totally incapacitating regardless of whether in conjunction with any or all of the foregoing complaint[s] . . . . Most individuals so labeled are capable of continued working." (Id. at UACL00691.) With regard to work restrictions, Dr. Curtis stated that "it is medically reasonable that she be limited to sedentary to light duties that allow for position changes as needed for comfort. It is also reasonable that she be allowed 2 or 3 rest breaks of 20 minutes or so during

20

each 8 hour work day." (Id.)

Dr. Curtis noted that his opinions were at odds with Dr. Kaufman's opinions regarding the extent to which Breniman could work. He stated that the reason for his disagreement was based on the following four facts:

> [1] Fibromyalgia is not generally a disabling disorder . . . [;]
> [2] Treatment has not included CT-BT or ongoing participation in physical activity, i.e. compliance have not been optimal[;]
> [3] Although heavy physical work might be difficult for her, there is no evidence to demonstrate that she is so physically impaired as to be precluded from the level of work noted . . . [; and]
> [4] The file contains no references to unavailable material that appear likely to add much clarity regarding her functional status. For the sake of completeness, it would be interesting to see any pulmonary records that may have been generated. However, any such records would be very unlikely to change the conclusions stated about functional capacities in a physical sense. (Again that postulated condition was apparently unimportant per SSA and advocacy letter.)

(Id. at UACL00690-691.)

On November 3, 2004, a vocational assessment was performed to determine whether Breniman could return to work in her own occupation with consideration given to the restrictions and limitations found by Dr. Curtis as sedentary to light duties. (Id. at UACL00697.) The review stated that "the job description from the employer indicates a job title of Senior Analyst with duties of research and analysis for defense acquisition, prepare position papers, and meetings. The duties would support an occupation that would [sic] sedentary to light." (Id.) The

review, therefore concluded that "the occupation as described by the employer and

employee would be expected to be performed and could be performed." (Id.)

On December 4, 2004, UNUM notified Breniman's attorney of its decision

to uphold the original decision denying benefits. (Pl. Ex. 21.) UNUM explained:

> The no deference medical review completed found that the totality of
> said conditions does not render your client totally incapacitated and
> unable to work. The medical documentation  supports [the finding
> that ] Ms. Breniman is capable of performing activities of sedentary
> to light capacity.
>
> Based on the findings supporting sedentary to light physical
> activities, a Vocational Consultant considered functionality based on
> the medical review and opined that she would not be precluded from
> working in her own occupation as described by her employer. The
> Social Security Disability Decision was also considered which finds
> that the approval was based primarily on claimant's psychological
> decision.

(Id.)

## IV.  Framework of Analysis

### A.  Three Levels of Scrutiny

The Eleventh Circuit has articulated three different levels of scrutiny in suits

involving benefits denials by the administrator of an ERISA plan. See, e.g., Shaw

v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003). First, in

circumstances where the plan does not vest the administrator with discretion to

determine eligibility for benefits or to construe the terms of the plan, the court

22

reviews the denial decision de novo.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Second, where the terms of the plan provide the administrator with such discretion, its decision to deny benefits is, as a general matter, afforded substantial deference and subjected to an "arbitrary and capricious" standard of review.  See Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1558 n.1 (11th Cir. 1990).

However, where a plan administrator, vested with discretion, has a conflict of interest,[10] this deferential review is adjusted, and a third standard of review is employed.  See id. at 1566-67.  That standard is one of "heightened" arbitrary and capricious review, and affords the administrator's decision to appreciably less deference than it would receive absent the conflict of interest.  Id.  This "heightened" level of scrutiny applies regardless of whether the dispute in question turns on a question of fact, or on the proper construction to be given the plan.  See Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003).

Here, the parties agree that UNUM was both vested with discretion under the plan and suffered from a conflict of interest.  As such, it is undisputed that the "heightened" arbitrary and capricious standard applies.  The court next reviews

---

[10] A plan administrator has a conflict of interest where it retains control over the decision-making process, and also pays the relevant benefits out of its own funds.  See Brown, 898 F.2d 1556 at 1566-67.

23

what this standard means in the Eleventh Circuit.

### B.  Heightened Arbitrary and Capricious Review

Under the "heightened" arbitrary and capricious standard of review, the court must apply three steps.[11]  First, under de novo review, the court determines whether the decision to deny benefits was "wrong."  Williams  v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).  A decision is "wrong" when the court disagrees with it.  See id.  If it is not "wrong," then the administrator prevails.  Id.  If the court determines that the decision was "wrong," however, it goes to the second step and determines whether the decision was nevertheless reasonable.  Id.  A decision is reasonable when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).  If the court determines that the administrator's decision was both "wrong" and not reasonable, then the claimant prevails.  Williams, 373 F.3d at 1138.

---

[11] Although the Eleventh Circuit has articulated the steps in several different ways, see, e.g., Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) (integrating steps to determine proper level of scrutiny with remainder of "test," arriving at six-prong analytical framework), where the parties agree that the administrator both possessed discretion in denying benefits and suffered from a conflict of interest, only three steps are needed to resolve the claimant's case.

A more difficult situation arises, however, when the administrator's decision to deny benefits is "wrong," but nevertheless reasonable.  Were the decision to be subjected only to an arbitrary and capricious standard of review, it would be entitled to deference, and the administrator would prevail.  Id.  Under the "heightened" arbitrary and capricious standard, however, something more is required before the administrator may escape liability.  See id.  The Eleventh Circuit has not decided what that "something" is.  See id.

In Brown v. Blue Cross & Blue Shield of Alabama, where the Eleventh Circuit first articulated the parameters of the "heightened" arbitrary and capricious standard, the Eleventh Circuit held

> that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

898 F.2d at 1566-67.  As the above indicates, however, Brown dealt with a dispute where the issue was the proper interpretation to be given the plan itself.  See id.  Later Eleventh Circuit decisions stated that Brown's "heightened" arbitrary and capricious standard of review applied equally to challenges to an administrator's

factual determinations.  See, e.g., Torres, 346 F.3d at 1329  Such decisions did not,

however, address the mechanics of the heightened standard to challenges of an

administrator's factual conclusions.

In Williams v. BellSouth Telecommunications, Inc., however, the Eleventh

Circuit reflected on earlier decisions which seemingly applied the "heightened"

arbitrary and capricious standard in the context of factual challenges to an

administrator's denial of benefits.  373 F.3d at 1138-39. Although acknowledging

the apparent application of the Brown test in these cases, the Eleventh Circuit

emphasized that it "did not say whether Brown's 'heightened arbitrary and

capricious,' burden-shifting approach should be applied to factual determination

cases like this." Id. at 1139.  The Eleventh Circuit, however, declined to articulate

an alternative formulation of the "heightened" arbitrary and capricious standard to

be applied in factual determination cases, because the case before it did not require

the Court to get to that step.  Id.   Instead, the Court "le[ft] the issue for another

day." Id.  A review of Eleventh Circuit decisions indicates that day has not yet

come.

## V.  Application

### A.  The First Step: Was the Decision "Wrong"?

At the outset, the court notes that many other courts have encountered

26

difficulties in reviewing disability benefit denials regarding claims of fibromyalgia. The subjective and inherently self-reported nature of fibromyalgia's primary symptoms of pain and fatigue complicate disability benefit decisions and the review of benefit denials. See Welch v. Unum Life Insurance Co. of America, 382 F.3d 1078, 1087 (10th Cir. 2004) (citing multiple cases analyzing the problems for disability insurers and courts reviewing their decisions presented by disorders, such as fibromyalgia, that have no objective test for diagnosis). Regardless of these problems, the court must decide whether UNUM was "wrong," under a de novo standard of review, when it denied Breniman's disability claim.

According to UNUM's brief, it denied Breniman's claim for three primary reasons: (1) Dr. Kaufman's medical records did not contain a comprehensive exam or document Breniman's movement or activity levels of functionality; (2) although Dr. Hernandez noted tender points, he did not find them impressive or document the number or location; and (3) Dr. Curtis, a medical consultant for UNUM, found little documentary support for extreme limitations and restrictions on non-psychiatric grounds, and his opined restrictions would allow Breniman to work at her previous occupation. (Def. Br. at 37-38.) Breniman argues that this decision was "wrong" because of the opinions of her treating physician, Dr. Kaufman, and

27

her rheumatologist, Dr. Hernandez.  (Pl. reply Br. at 23-24.)   Breniman also

contends that UNUM failed to adequately take into account the decision of the

Social Security Administration, and failed to submit Breniman for an independent

medical examination.  (Id. at 24-25.)

     After a thorough review of the record, the court finds that a genuine issue of

material fact exists with respect to whether the decision was "wrong."  The factual

conflict is clear.  Breniman presented evidence that she was totally disabled,

including medical records and statements from Dr. Kaufman and Dr. Hernandez.

Dr. Kaufman stated, as early as May 14, 2003, that Breniman was totally disabled

from a physical standpoint.  (Pl. Ex. 10.)  The functional capacities evaluation

completed by Kaufman on that date indicated that Breniman was severely limited

in repetitive and varied tasks, and that she was severely limited in performing her

previous job.  (Id.)   Dr. Kaufman's medical assessments and functional capacities

evaluations documented a deterioration of Breniman's condition.  (Pl. Exs. 11-12.)

In addition, Dr. Hernandez stated that he treated Breniman for fibromyalgia which

"continue[s] to be symptomatic with symptoms that include neck pain and spasms,

fatigue and insomnia.  The patient has been unable to keep up with the studies

[sic] of a regular work schedule in the past."  (Pl. Ex. 18.)  Moreover, the Social

Security Administration found that "[t]he medical evidence establishe[d] that

28

[Breniman] has bipolar disorder, fibromyalgia, generalized anxiety disorder, osteoarthritis, and irritable bowel syndrome, which are 'severe' impairments under the Social Security Act." (Pl. Ex. 20.)  "Severe" impairments are ones that significantly limit a claimant's mental or physical ability to do basic work activities.  20 C.F.R. § 404.1521.

The evidence compiled by UNUM stands in stark contrast to the diagnoses and medical records of Dr. Kaufman and Dr. Hernandez.  As thoroughly explained in sections III.B.2 and III.C.2, UNUM compiled its own evidence through three reviews by medical professionals of Breniman's records.[12]  Janet Shepard concluded that there were "no compelling clinical findings to support functional deficit secondary to a medical condition." (Pl. Ex. 14.)  Dr. Caruthers similarly concluded that "there is zero evidence in this file for any significant physical impairments due to [general medical problems]." (Pl. Ex. 15.)  Only the vocational consultant, Dr. Curtis, found any medical evidence that suggested work limitations and/or restrictions.  (Def. Ex. Doc. No.  UACL00697.)  Those opined limitations and/or restrictions, however, were vastly different than those stated by

---

[12] These records were the statements and medical records from Dr. Kaufman, Dr. Hernandez, and others.  UNUM's review of the records discredits the doctors' statements regarding Breniman's ability to work.

Dr. Kaufman and Dr. Hernandez.[13]  (Id. at UACL00691.)

Given the sharply contrasting evidence in this case, and considering the opinions of Dr. Kaufman and Dr. Hernandez, and the determination of the Social Security Administration (although, the court acknowledges that a large portion of this decision was based on mental disability), a genuine issue of material fact exists as to whether Breniman is totally disabled within the meaning of the plan. See Shaw, 353 F.3d at 1286-87 (holding that conflicting opinions of various medical providers precluded summary judgment on ERISA claim).  As such, the court cannot conclude for purposes of summary judgment that UNUM's factual conclusion was not "wrong."  The court, therefore, must proceed to the next step in the analysis.

### B.  The Second Step: Is the Interpretation Reasonable?

As explained above, in the next step of the analysis, the court must determine whether "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  Jett, 890 F.2d at 1139.  The court finds that UNUM has adequately demonstrated the

---

[13] Although Dr. Curtis agreed with Dr. Kaufman and Dr. Hernandez that Breniman had symptoms consistent with fibromyalgia, he opined that "most individuals" are still capable of working.  (Def. Ex. Doc. No. UACL00692.)  The court notes, however, that "most" does not mean all, and Dr. Curtis never examined Breniman to see if she was in the minority of patients. In fact, Breniman never underwent a physical examination by a neutral physician.

absence of a genuine issue of material fact regarding whether the decision was reasonable.  Evidence in the record, including some of the medical records from Breniman's rheumatologist, Dr. Hernandez, the vocational assessment, as well as the other medical reviews compiled at UNUM's request, and the nature of fibromyalgia in general, tend to show that plaintiff was either (1) disabled only because of her mental disability or (2) capable of performing either light or sedentary work with some rest breaks during the work day.  Such evidence provided UNUM with a "reasonable basis" to deny Breniman disability benefits based on a physical disability, notwithstanding the contrary evidence produced by Breniman.  See Jett, 890 F.2d at 1139; see also Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1452 (11th Cir. 1997) (concluding decision to terminate benefits "reasonable," and affirming summary judgment in favor of plan, notwithstanding some evidence supporting plaintiff's disability).

## C.  The Third Step: Heightened Review

As discussed earlier, the standard to be applied when the court finds that the provider was "wrong," but reasonable, is an open question in the Eleventh Circuit. The parties have not attempted to articulate a standard that the court should apply. As such, the court reviewed other district court decisions in the Eleventh Circuit to see how these courts dealt with this problem.  After this review, the court is

persuaded by the reasoning of Judge Story of the Northern District of Georgia.

## 1.  The Standard

In <u>Wise v. Hartford Life and Accident Insurance Co.</u>, Judge Story

encountered the very same problem presented by this case.  360 F. Supp.2d 1310

(N.D. Ga. 2005).  After recounting the state of the law in the Eleventh Circuit and

the problems associated with application of the <u>Brown</u> test in factual

determination cases, Judge Story articulated the following standard, which was

alluded to in <u>Brown</u> by the Eleventh Circuit:

> [A] conflicted plan administrator may carry its burden in a suit
> challenging a "wrong but reasonable" factual determination if it can
> demonstrate that the opinions and evidence it relied on denying the
> plaintiff's claim were, viewed both from a qualitative and quantitative
> perspective, at least as objectively reliable as the countervailing
> opinions and evidence then before it.  By demonstrating that it chose
> to follow what it reasonably perceived as equally or more objectively
> reliable data, the insurer substantially ameliorates any fears that its
> decision was motivated by self-interest rather than by a good faith
> effort to exercise its discretion to interpret and apply the plan.  Should
> the administrator meet this burden, the plaintiff can then prevail only
> if he demonstrates that the decision was arbitrary and capricious by
> "other measures."

<u>Id.</u> at 1323.  The court is persuaded that this test addresses the concerns articulated

in <u>Brown</u>.  Although neither party briefed this issue, the court will apply this

standard to the record before it.

32

2.  Application of that Standard

The court concludes that genuine issues of material fact exist regarding the comparative objective reliability of the information before UNUM at the time it made the denial decision.  Breniman has produced evidence from her treating physician, Dr. Kaufman, that she is disabled.  In addition, Dr. Hernandez, her treating rheumatologist, stated that Breniman was not able to keep up with a regular work schedule.  (Pl. Ex. 18.)  Although the court acknowledges that "plan administrators are not obliged to accord special deference to the opinions of treating physicians[,]" and that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 & 834 (2003), the court notes the status of Dr. Kaufman and Dr. Hernandez as examining physicians to emphasize that they had actual contact with Breniman.  In contrast, all the evidence compiled by UNUM resulted out of reviews of Breniman's medical file.  As Judge Story stated in Wise, this distinction "speaks to the reliability of their conclusions (especially given the dynamic nature of [Breniman's] condition)."  Wise, 360 F.Supp.2d at 1325 n.14 (citing Godfrey v. BellSouth Telecomms., Inc., 89 F.3d 755, 758-59 (11th Cir. 1996) (observing potential usefulness of in person exam of fibromyalgia patient in

33

ascertaining disability)).  UNUM has not produced any evidence to call into

question the reliability of the medical opinions of Dr. Kaufman and Dr.

Hernandez.

In addition, Breniman obtained a decision from the Social Security

Administration that she is "disabled" within the meaning of the Social Security

Act.  Although this decision relies on both her mental and physical impairments in

making its determination, UNUM's argument that the decision was based solely

on Breniman's mental disability is not well taken.  The court is aware that Social

Security decisions are not binding on a plan administrator and that differences

exist between the Social Security disability determinations and ERISA benefit

plan determinations.  However, to some extent (however small), the Social

Security determination bolsters the reliability of Breniman's evidence.

On the other hand, UNUM had two primary medical reviews which

completely rejected that Breniman was disabled in any way, and one review by a

vocational specialist, which acknowledged some work restrictions, but opined that

she could still do her past work.  The court is not persuaded that this evidence

establishes as a matter of law that the information relied upon by UNUM in

making its decision was more objectively reliable than that supporting Breniman's

claim.  The court particularly notes that all the evidence compiled by UNUM was

34

based on paper files; UNUM never had a neutral, independent physician examine Breniman to resolve the conflicting medical information.  In addition, the reviews by Shepard and Dr. Caruthers quickly dismiss the opinion of Breniman's treating physicians without explanation.  Both Shepard's and Caruthers's reports appear selective in their analysis of these medical records.   Nowhere in their reviews do the specialists employed by UNUM review the functional capacities assessments completed by Kaufman.  In addition, Shepard's analysis seems to hinge on her opinion that fibromyalgia is an "ill defined syndrome" and a "diagnosis of exclusion."  (Pl. Ex. 14.)  Therefore, because of the conflicting evidence before UNUM, the evidence in support of Breniman's claim, and the apparent omissions in the materials relied upon by UNUM, the court finds that genuine issues of material fact remain.

## VI.  Conclusion

In summary, the court finds that material issues of fact remain and that neither defendant nor plaintiff is entitled to judgment as a matter of law.  As such, plaintiff Margaret Breniman's motion (docs. # 10-11) for summary judgment is due to be denied, and defendant UNUM Provident, UNUM Life Insurance Company of America's motion (doc. # 13)  for summary judgment is due to be denied.  A separate order will be entered.

**DONE** this 2nd day of  December, 2005.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**